**MAINSTREAM MARKETING SERVICES, INC., a Colorado corporation; TMG Marketing, Inc., a Colorado corporation; and American Teleservices Association, Plaintiffs,**

v.

**FEDERAL TRADE COMMISSION; Timothy J. Muris, Chairman of the Federal Trade Commission, in his official capacity; Sheila F. Anthony, Commissioner, Federal Trade Commission, in her official capacity; Mozelle W. Thompson, Commissioner, Federal Trade Commission, in his official capacity; Orson Swindle, Commissioner, Federal Trade Commission,**

**in his official capacity; Thomas B. Leary, Commissioner, Federal Trade Commission, in his official capacity; and J. Howard Beales III, Director, Bureau of Consumer Protection, in his official capacity, Defendants.**

**No. CIV. A. 03 N 0184.**

United States District Court, D. Colorado.

Sept. 25, 2003.

Sean R. Gallagher, Esq., Marianne N. Hallinan, Esq., Hogan & Hartson, Denver, CO, Robert Corn–Revere, Esq., Ronald G. London, Esq., Davis Wright Tremaine, LLP, Washington, D.C., for Plaintiffs.

Lawrence DeMille–Wagman, Esq., Federal Trade Commission, Office of the General Counsel, Washington, D.C., for Defendants.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

This case concerns the validity and constitutionality of the Federal Trade Commission's amended Telemarketing Sales Rules (hereinafter "amended Rules"). The amended Rules create a federal registry consisting of names and telephone numbers of consumers who have indicated, by placing their name and number on the registry, that they do not wish to receive unsolicited telephone calls from those marketers to whom the amended Rules apply. This is commonly known as a do-not-call registry because the amended Rules prohibit certain types of telemarketers from calling those telephone numbers. The amended Rules also prohibit calls that, to make mass calling more efficient, are dialed by equipment and subsequently dropped when answered by the consumer because the salesperson is delayed on a previous call. These calls are denominated in the telemarketing industry as abandoned calls.

Plaintiffs allege that, when the FTC promulgated the amended Rules, it (1) violated the First and Fifth Amendments to the United States Constitution; (2) exceeded its statutory authority under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C.A. §§ 6101–6108 (West 1998 & Supp.2003) (hereinafter "Telemarketing Act"); and (3) acted arbitrarily and capriciously under the Administrative Procedure Act, 5 U.S.C.A. § 551 (West 1996 and Supp.2003) ("APA"). This matter is before the court on (1) "Plaintiffs' Motion for Summary Judgment," filed May 2, 2003, (2) "Defendants' Cross–Motion for Summary Judgment," filed May 30, 2003, and (3) the parties' "Consent Motion for Leave To Amend Complaint," filed August 5, 2003. Because it is uncontested and plainly proper under the federal rules, the motion to amend will be granted without discussion. Jurisdiction is based on the existence of a federal question. *See* 28 U.S.C.A. § 1331 (West 1993 & Supp.2003).

## FACTS

### 1. Factual and Statutory Background

Many different organizations, including businesses, charities, religious groups, and political parties, generate revenue by calling individuals in their homes and soliciting sales and donations. This practice, known as telemarketing, has grown into an industry that generates $275 billion dollars annually and employs roughly 5.4 million persons in the United States. (Mem. Supp. Pls.' Mot. for Summ. J. at 7 [filed May 2, 2003] [hereinafter "Pls.' Br."]) Organizations perform their telemarketing activities in a variety of ways. Some uti-

lize their own employees or volunteers to perform telemarketing activities. Others hire independent telemarketing companies that operate call-centers to make solicitations on their behalf. Plaintiffs Mainstream Marketing and TMG are independent telemarketing companies based in Colorado. (First Am. Compl. for Decl. and Inj. Relief ¶¶ 14, 17–18 [filed August 5, 2003] [hereinafter "Am. Compl."].) Plaintiff American Teleservices Association is a national non-profit association of telemarketing companies which represents its members' commercial interests and engages in self-regulation of the industry. (*Id.* ¶ 19; Pls.' Br. at 8.)

In 1991, Congress passed the Telephone Consumer Protection Act of 1991 ("TCPA"), wherein it granted the Federal Communications Commission the authority to promulgate rules creating a procedure to protect telephone subscribers from receiving unwanted telemarketing calls. 47 U.S.C.A. §§ 227(c)(1)(A)-(E), (c)(3) (West 2001 & Supp.2003). The TCPA suggests the creation of a national database as a method of preventing subscribers' reception of unwanted calls, but it does not require the FCC to implement such a do-not-call list. *Id.* By its own terms, the TCPA prohibits telemarketers from (1) using automatic telephone dialing systems to make calls or send prerecorded messages to emergency lines, hospital and elderly home lines, and cellular telephone lines, and (2) making any calls with prerecorded messages to any line unless the FCC chooses to exempt the particular type of telemarketer making the call. *Id.* § 227(b)(1)(A). Finally, the TCPA grants the FCC the limited authority to exempt telemarketers making

> calls that are not made for a commercial purpose; and such … calls made for a commercial purpose that the Commission determines will not adversely affect the privacy rights that this section is

intended to protect, and do not include the transmission of any unsolicited advertisement.

*Id.* § 227(b)(2)(B). As of January 2003, when this case was filed, the FCC had utilized this grant of authority to pass rules creating company-specific do-not-call lists and prohibiting use of automatic telephone dialers and prerecorded messages, but it had not yet adopted rules creating a national database for a do-not-call registry. 47 C.F.R. § 64.1200 (2002).

In 1994, Congress enacted the Telemarketing Act, wherein it granted the FTC the authority to promulgate rules prohibiting "deceptive or abusive telemarketing practices." 15 U.S.C.A. § 6102. Congress specifically found that consumers were being increasingly victimized by telemarketing fraud and other abuses, and it required the FTC in promulgating its rules to (1) define "deceptive telemarketing acts or practices," (2) prohibit abusive patterns of unsolicited telephone calls, (3) restrict the hours of the day when telemarketing calls may be placed, and (4) require telemarketers to promptly disclose to call recipients the nature of their call. *Id.* § 6102(2)-(3). In response to this mandate, the FTC adopted the Telemarketing Sales Rules (the "Rules") on August 16, 1995. 16 C.F.R. Part 310; 60 Fed.Reg. 43842 (August 23, 1995). These Rules prohibit credit card laundering, mandate prompt disclosure of the nature of the call, and prohibit, among other things, threatening or repetitive calls 16 C.F.R. §§ 310.3, 310.4 (2003).

On two occasions in 2002, the FTC proposed revisions to the Rules. In January 2002, the FTC issued a notice of proposed rule making, suggesting a revision of the Rules and the creation of a do-not-call registry. 67 Fed.Reg. 4492 (January 30, 2002). In May 2002, the FTC issued an-

other notice of proposed rule-making which would further amend the Rules to impose fees on telemarketers for access to the do-not-call registry. 67 Fed.Reg. 37362 (May 29, 2002).

In December 2002, the FTC issued the amended Rules which are the subject of this case. The amended Rules prohibit "deceptive or abusive telemarketing acts or practices." 16 C.F.R. § 310.4(b). Included among the definitions of an "abusive telemarketing act"is the following:

> ▮ initiating any outbound telephone call to a person when ... that person's telephone number is on the 'do-not-call' registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls *to induce the purchase of goods or services* ....

*Id.* § 310.4(b)(1)(iii)(B)(emphasis added). Under the amended Rules, consumers may add their names and telephone numbers to a registry of numbers. *Id.* All telemarketers are prohibited from making calls to numbers on the registry to induce the purchase of goods and services. *Id.* An exception is made for businesses that have obtained prior written consent from the consumer, or have "an established business relationship" with the consumer, defined as a business transaction occurring in the previous eighteen months. 16 C.F.R. § 310.4(b)(1)(iii)(B)(i)-(ii). Also exempted from the do-not call requirements are those businesses beyond the jurisdictional reach of the FTC, including banks, insurance companies, and common carriers. 15 U.S.C.A. § 6105. Finally, the amended Rules contain an exemption which is critical to this case. They exempt from the do-not-call registry organizations soliciting charitable contributions. 16 C.F.R. § 310.6(a).

The amended Rules also define abusive telemarketing practices as

abandoning any outbound telephone call. An outbound telephone call is 'abandoned' under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

*Id.* § 310.4(b)(1)(iv). A telemarketer is allowed to abandon the occasional call under the amended Rules if

> the telemarketer employs technology that ensures abandonment of no more than three (3%) percent of all calls answered by a person, measured per day per calling campaign, and whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed.

*Id.* § 310.4(b)(4)(i)-(ii). The amended Rules go into effect on October 1, 2003. (Pls.' Br., Statement of Undisputed Material Facts ¶ 13); *admitted at* Defs.' Mem. of Points and Authorities in Supp. of its Cross–Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 13 [filed May 30, 2003] [hereinafter "Defs.' Br."].

In promulgating the amended Rules, the FTC sought to protect the consumer's right to privacy in his own home and the right to be free from unwanted telephone calls. 68 Fed.Reg. at 4635. To that end, the FTC established the do-not-call registry requirements for all *commercial* telemarketing calls. *Id.* at 4635. Specifically, the FTC found that the previous company-specific do-not-call rules, which permitted a consumer to request that his name be removed from a company's call list, were insufficient to protect consumers from un-

wanted calls for several reasons. *Id.* at 4629. First, the FTC found that telemarketers interfered with consumers' attempts to be placed on company-specific lists by hanging up on them or ignoring their request. *Id.* Additionally, the FTC noted that (1) the prior practice placed too much burden on consumers who had to repeat their do-not-call request with every telemarketer who called; (2) the company-specific list continually exposed consumers to unwanted initial calls which had significantly increased in numbers since adoption of the original FTC Rules; and (3) consumers had no method to verify that their name had been removed from the company's list. *Id.*

As noted previously, the FTC exempted charitable organizations from the do-not-call requirements. In doing so, it cited the heightened First Amendment protection afforded charitable speech. *Id.* at 4586, 4635 Additionally, the FTC found that abusive telemarketing practices, which the registry sought to combat, were more likely to be undertaken by commercial telemarketers than those soliciting charitable and political contributions. *Id.* at 4635, 4637. The FTC admitted, however, that the interest of protecting privacy did not justify a distinction between commercial and charitable telemarketing calls because privacy was equally invaded regardless of the speech content of the telephone call. *Id.* Estimates indicate that forty to sixty percent of telemarketing calls will be affected by the do-not-call list.[1] (Pls.' Br. at 10; Pls. Reply at 27.)

On March 11, 2003, after the FTC announced its amended Rules, Congress enacted the Do–Not–Call Implementation Act ("Implementation Act"). Pub.L. No. 108–10, 7 Stat. 557 The Implementation Act provides

The Federal Trade Commission may promulgate regulations establishing fees sufficient to implement and enforce the provisions relating to the 'do-not-call' registry of the Telemarketing Sales Rule (16 C.F.R. § 310.4(b)(1)(iii)), promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101 et seq.).... Not later than 180 days after the date of enactment of this Act, the Federal Communications Commission shall issue a final rule pursuant to the rulemaking proceeding that it began on September 18, 2002, under the Telephone Consumer Protection Act (47 U.S.C. §§ 227 et. seq.). In issuing such rule, the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission (16 C.F.R. § 310.4(b)).

*Id.* Pursuant to the Implementation Act and the Telemarketing Act, the FTC, on April 3, 2003, announced its intention to charge a fee to companies subject to the FTC's do-not-call registry for access to the numbers on the registry. 68 Fed.Reg. 16238 (April 3, 2003).

Similarly, pursuant to the Implementation Act and the TCPA, the FCC recently announced its intention to adopt rules sim-

---

1. There is no exact estimate of the number of calls that will be reduced in the administrative record or elsewhere. There are estimates, however, of the percentage reduction of telemarketing business and employment. The FTC faults the telemarketing industry for refusing to provide the FTC with the information necessary to estimate the percentage reduction in calls. Plaintiffs fault the FTC for failing to engage in proper research of the issue before promulgating the regulations. For purposes of this ruling, the court will consider the telemarketing industry's estimate of percentage reduction in business as the proper measure of the do-not-call registry's effect on telemarketing calls.

ilar to the FTC's, enforcing the do-not-call list. On July 25, 2003, the FCC promulgated rules mirroring the FTC's amended Rules and adding entities subject to the do-not-call restrictions, to include those beyond the reach of the FTC's jurisdiction, such as banks, insurance companies, and common carriers. 68 Fed.Reg. 44144 (July 25, 2003); 47 C.F.R. 64.1200 (2003). The FCC do-not-call rules, like the FTC's, do not apply to entities making calls on behalf of nonprofit organizations. *Id.* § 64.1200(f)(9).

On July 31, 2003, the FTC promulgated its final rule concerning the fees imposed on entities accessing the national do-not-call registry, to be codified at 16 C.F.R. § 310.8 (2003). 68 Fed.Reg. 45134 (July 31, 2003). These new fee Rules provide that any seller wishing to initiate, or cause any telemarketer to initiate, an outbound telephone call to any person in a particular area code, must first pay a fee for access to the do-not-call registry pertaining to that area code. 16 C.F.R. § 310.8(a). The rules further states:

> The annual fee ... is $25 per area code of data accessed, up to a maximum of $7,375; provided, however, that there shall be no charge for the first five area codes of data accessed by any person, and provided further, that there shall be no charge to any person engaging in, or causing others to engage in, outbound telephone calls to consumers and who is accessing the National Do–Not–Call Registry without being required under this Rule, 47 C.F.R. § 64.1200, or any other federal law.

*Id.* § 310.8(a).

## 2. *Procedural Background*

Plaintiff filed a complaint in this court for declaratory and injunctive relief on January 29, 2003, seeking an injunction prohibiting the FTC's application and enforcement of its amended Rules. (Compl. for Decl. and Inj. Relief [filed January 29, 2003] [hereinafter "Compl."].) On February 28, 2003, plaintiffs filed a motion for a preliminary injunction, arguing that their likelihood of success in their case mandated issuance of a preliminary injunction. (Pls.' Mot. for Prelim. Inj. [filed February 28, 2003] [hereinafter "Mot. for Prelim. Inj."].) Plaintiffs withdrew this motion on May 23, 2003, after filing their motion for summary judgment on May 2, 2003. (Notice by Pls. of Withdrawal of Pls.' Mot. for Prelim. Inj. [filed May 23, 2003]; Pls.' Br.)

On August 5, 2003, plaintiffs filed a consent motion to amend their complaint to state claims against the FTC based on the new fee Rules and to withdraw all claims against individual defendants, other than the FTC. (Consent Mot. for Leave To Am. Compl. [filed August 5, 2003] [hereinafter "Mot. to Am. Compl."].) In their proposed first amended complaint, plaintiffs allege that the fee violates the First Amendment and the APA. (Am. Compl. ¶¶ 172–182.) At a status conference on August 11, 2003, the court allowed the parties an opportunity to supplement their cross-motions for summary judgment, based on the new claims asserted in plaintiffs' proposed amended complaint. On August 21, 2003, plaintiffs and defendants filed supplemental memoranda supporting their opposing positions regarding the lawfulness of the FTC's new fee Rules. (Supplemental Mem. Supp. Pls.' Mot. for Summ. J. [filed August 21, 2003] [hereinafter "Pls.' Supp. Br."]; Defs.' Mem. of Points & Authorities in Supp. of its Mot. for Summ. J. with Respect to Counts 9–11 of the First Am. Compl. [filed August 21, 2003] [hereinafter "Defs.' Supp. Br."].)

## ANALYSIS

In their motion for summary judgment, plaintiffs dub the amended Rules an act of

"regulatory imperialism," which borrows from the reasoning of the pigs in George Orwell's "Animal Farm." (Pls.' Br. at 2, 31 ["Some animals are more equal than others"]) Specifically, plaintiffs argue that the amended Rules concerning the do-not-call registry and fees violate the First and Fifth Amendments by (1) imposing a prior restraint on speech, (2) discriminating based on speech content, and (3) failing to forward a substantial interest, materially advance the state's interest, or create narrowly tailored remedies. (Pls.' Br. at 23–48; Pls.' Supp. Br. at 13–25.) Secondly, plaintiffs claim that the FTC does not have authority from Congress under the Telemarketing Act to promulgate the amended Rules because the creation of a do-not-call registry and regulation of abandoned calls were powers specifically granted to the FCC under the TCPA, not the FTC under the Telemarketing Act. (Pls.' Br. at 48–59.) Plaintiffs finally argue that the FTC's promulgation of the amended Rules and fee provisions was arbitrary and capricious because the rules are unsupported by the record and comments that were before the FTC at the time of promulgation. (*Id.* at 59–67; Pls.' Supp. Br. at 25–28.)

Defendants filed a response to plaintiffs' motion for summary judgment and their own motion for summary judgment on May 30, 2003. (Defs.' Br.) Defendants counter that the amended Rules pass First Amendment constitutional muster under the test for commercial speech set forth in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). (*Id.* at 18, 23–37.) Additionally, defendants claim the Telemarketing Act does grant the FTC the authority to create a do-not-call registry and regulate abandoned calls. (*Id.* at 14–17, 44–49.) Defendants finally claim that the FTC's promulgation of the amended Rules was not arbitrary and capricious because the FTC considered over

64,000 comments and made clear findings justifying the amended Rules in the rule-making record at 68 Fed.Reg. at 4580–4679. (*Id.* at 38–43.)

## 1. Standard for Summary Judgment & Review of Agency Action

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). The non-moving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed.R.Civ.P. 56(e).

A genuine issue of fact does not exist, and summary judgment is appropriate, if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. If the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment

may be granted. *Id.* at 249, 106 S.Ct. at 2511 In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

*Id.* at 252, 106 S.Ct. at 2512. The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.1985). Additionally, the court, when ruling on a motion for summary judgment, must construe the facts in the light most favorable to the nonmoving party. *Id.* Here, the parties agree that there is no dispute as to any material fact and that summary judgment is appropriate as a matter of law. Accordingly, this court's role is to apply the law to the undisputed facts.

When a court reviews agency action, the reviewing court shall

> hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . .

5 U.S.C.A. § 706(2)(A)-(C) (West 1993 & Supp.2003). Here, the court is called upon to review the FTC's actions under the Constitution, statute, and the APA. Accordingly, the court is mindful of separate and distinct standards of review in this case. Each standard is addressed in turn.

### 2. First Amendment

■ Plaintiffs claim that the rules creating the do-not-call registry and establishing fees to access the registry violate the First Amendment to the United States Constitution. Under the APA, the court

must therefore determine whether the FTC's rules are "contrary to constitutional right." 5 U.S.C.A. § 706(2)(B); *U.S. West, Inc. v. Fed. Communications Comm'n,* 182 F.3d 1224, 1231 (10th Cir.1999), *cert denied sub nom. Competition Policy Inst. v. U.S. WEST, Inc.,* 530 U.S. 1213, 120 S.Ct. 2215, 147 L.Ed.2d 248 (2000). In contrast to the situation where a rule is asserted to be improper when measured against the enabling statute, the court owes no deference to the agency's position that the rule is a permissible interpretation of the Constitution. *See, e.g., Hill v. Nat'l Transp. Safety Bd.,* 886 F.2d 1275, 1278 (10th Cir.1989); *Porter v. Califano,* 592 F.2d 770, 780 (5th Cir.1979). If the court determines that the amended Rules violate the First Amendment, they must be invalidated.

The FTC's do-not-call registry provides consumers with a procedure by which to refuse and prevent all commercial calls by telemarketers to their residential phone line. 16 C.F.R. § 310.4(b). By signing up for the do-not-call list, a consumer indicates he will not accept commercial calls by telemarketers. A consumer cannot use the list, however, to prevent calls from charitable organizations or businesses with which the consumer has had a relationship in the past eighteen months. *Id.* § 310.6(a). Instead, the consumer must independently notify these entities that the consumer does not wish to receive calls from them. In this regard, the FTC has established a mechanism by which a consumer may refuse commercial, but not other types of, speech.

■ Commercial speech is defined as speech that proposes a financial transaction. *Central Hudson,* 447 U.S. at 562, 100 S.Ct. at 2349. There is no doubt that the First Amendment protects this type of speech from unwarranted government regulation. *Id.* at 561, 100 S.Ct. at 2350. The

First Amendment's concern for commercial speech is based on the informational function of advertising. *Id.* at 563, 100 S.Ct. at 2350. "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.* at 561–562, 100 S.Ct. at 2349. In applying the First Amendment to commercial speech, the Supreme Court has rejected the highly paternalistic view that the government should be involved in assessing the value of, and determining, what consumers should and should not hear. *Id.; Edenfield v. Fane,* 507 U.S. 761, 767, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993). This view stems from a belief that a "consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 481–482, 115 S.Ct. 1585, 1589, 131 L.Ed.2d 532 (1995) (quoting *Virginia Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 763, 96 S.Ct. 1817, 1826 ([1976]).)

■ Despite the value of commercial speech, however, it is afforded lesser protection under the First Amendment than other types of speech, such as speech soliciting donations for political or charitable causes. *Central Hudson,* 447 U.S. at 562, 100 S.Ct. at 2349; *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980). Charitable solicitation of funds does more than inform private economic decisions because it involves the dissemination of views and the advocacy of political and social causes. *Village of Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 834. It is, therefore, protected more highly than commercial speech. Commercial speech also receives lesser protection because, to require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the First Amendment's guarantee with respect to the latter kind of speech. *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 623, 115 S.Ct. 2371, 2375, 132 L.Ed.2d 541 (1995).

■ The protection afforded commercial speech under the First Amendment depends upon the nature of the speech and the government interests served by its regulation. *Central Hudson,* 447 U.S. at 563, 100 S.Ct. at 2350. The First Amendment does not protect commercial speech that is untruthful or concerns unlawful activity. *Id.; Florida Bar,* 515 U.S. at 623, 115 S.Ct. at 2375. Commercial speech that falls into neither of those categories may be regulated, however, if: (1) the government asserts a substantial interest in support of the regulation; (2) the government demonstrates that the restriction on commercial speech directly and materially advances that interest; and (3) the regulation is narrowly tailored. *Central Hudson,* 447 U.S. at 564–565, 100 S.Ct. at 2351; *Florida Bar,* 515 U.S. at 624, 115 S.Ct. at 2376. The court applies intermediate scrutiny—somewhere between the "least-restrictive means" test used in some cases involving freedom of the press and the "rational basis" test used in fourteenth amendment equal protection analysis—in making the determination whether a regulation of commercial speech offends the First Amendment. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2351; *Florida Bar,* 515 U.S. at 623, 115 S.Ct. at 2375.

### A. Do the Amended Rules Amount to Governmental Restriction on Lawful Commercial Speech

■ Before applying the three prong test enumerated in *Central Hudson,* the court must determine whether the FTC's

do-not-call registry and fee Rules qualify as a type of regulation implicating the First Amendment. Specifically, the regulations must amount to a government restriction on lawful and truthful commercial speech. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2351. The amended Rules amount to a government restriction on lawful and truthful commercial speech for several reasons.

First, the do-not-call registry affects lawful and truthful commercial speech that is protected under *Central Hudson.* The do-not-call registry and its fees apply to all "outbound telephone calls to induce the purchase of goods and services." 16 C.F.R. § 310.4(b)(1)(iii)(B). "Solicitations to induce charitable contributions" are not covered by the registry, and "charitable contributions" are defined as "any donation or gift of money or any other thing of. value." *Id.* §§ 310.2(f), 310.6(a). Since the registry and its fees only apply to speech intended to induce the purchase of goods and services, the regulations only apply to speech proposing a financial transaction, or commercial speech, as it is defined under the First Amendment. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2351. Additionally, the regulations refer to all commercial speech without regard to truthfulness or lawfulness and, therefore, concern lawful commercial speech which is protected by the First Amendment. *Id.; Florida Bar,* 515 U.S. at 623, 115 S.Ct. at 2375.

A more troubling question is whether the regulations are a "government restriction" on speech that even implicates the First Amendment. The amended Rules do not restrict speech by explicitly and direct-ly limiting it. Instead of placing an outright ban on commercial telemarketing calls, the FTC has merely provided a mechanism by which the individual can choose to ban all commercial telemarketing calls to his residence. The Supreme Court addressed the constitutionality of a similar regulation in *Rowan v. United States Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).[2]

In *Rowan,* the Court upheld a statute which allowed an addressee to refuse mail from any sender by notifying the local postmaster, who then instructed the sender to remove the addressee's name and address from its mailing list under penalty of law. *Rowan,* 397 U.S. at 738, 90 S.Ct. at 1491. The court found that the statute did not violate the First Amendment because the purpose of the statute was to eliminate governmental involvement in any determination concerning the content of the materials and to allow the addressee complete and unfettered discretion in electing what speech he desired to receive. *Id.* at 738, 90 S.Ct. at 1491 The First Amendment right to speak was only circumscribed by an affirmative act—the addressee's giving notice that he no longer wished to receive mail from the sender. *Id.* at 737, 90 S.Ct. at 1490. The court categorically rejected the argument that a vendor has the right to send unwanted material into the home of another and found that the statute did not operate as a government restriction on speech. *Id.* at 738, 90 S.Ct. at 1491. Accordingly, the statute in *Rowan* was upheld as constitutional. *Id.*

**2.** In *Rowan,* the Supreme Court did not address the applicability of the *Central Hudson* test to the statute in question. Instead, the court held at the outset that the government was not sufficiently involved in restricting speech to implicate First Amendment con-cerns. *Rowan,* 397 U.S. at 738, 90 S.Ct. at 1491. Because *Rowan* did not apply the *Central Hudson* test, the court in this opinion will address the questions raised by *Rowan* prior to analysis under Central Hudson.

Relying on *Rowan*, the FTC argues that any burden imposed on commercial speech by the do-not-call registry is imposed by the actions of individual consumers rather than the government. (Defs.' Br. at 18–19.) According to the FTC, the do-not-call registry, like the statute in *Rowan*, does not implicate First Amendment concerns because the government is not sufficiently involved in determining what speech an individual does and does not hear. Plaintiffs argue that the registry system favors one kind of speech over another and manipulates consumer choice, unlike the statute in *Rowan*, making it a government restriction implicating the First Amendment. (Pls.' Br. at 27–29.)

The court rejects the FTC's position and holds that the do-not-call registry sufficiently involves the government in the regulation of commercial speech to implicate the First Amendment and require the application of the *Central Hudson* test. An important distinction between *Rowan* and this case is that, in *Rowan*, the individual had complete autonomy to prevent any chosen material from entering his home. The government's regulation had no bearing on this choice. *Rowan*, 397 U.S. at 728, 90 S.Ct. at 1484. In fact, the Supreme Court specifically stated:

> Both the absoluteness of the citizen's right under [the statute] and its finality are essential .... In operative effect the power of the householder under the statute is unlimited; he may prohibit the mailing of a dry goods catalog because he objects to the contents .... Congress provided this sweeping power not only to protect privacy but to avoid possible constitutional questions ....

*Rowan*, 397 U.S. at 737, 90 S.Ct. at 1491

Here, however, the FTC, by exempting charitable solicitors from the amended Rules' do-not-call registry, has imposed a content-based limitation on what the con-

sumer may ban from his home. Although the consumer does retain the choice whether to sign up for the registry, the government has removed the absoluteness of that autonomy by itself exempting certain types of speech from the restrictions of the registry. Any consumer who desires to refuse all telemarketing calls, commercial and noncommercial, cannot enforce that preference. Although these consumers may refuse calls for charitable contributions through the company-specific list, telemarketing calls soliciting charitable contributions will ring through to the consumer, while commercial calls will not. The mechanism purportedly created by the FTC to effectuate consumer choice instead influences consumer choice, thereby entangling the government in deciding what speech consumers should hear. This entanglement creates a regulatory burden on commercial speech.

Furthermore, the fact that the do-not-call registry is not an outright government ban on commercial speech does not mean that it is not a burden implicating the First Amendment. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000). "The distinction between laws burdening and laws banning speech is but a matter of degree. The government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Id.* Based on the holdings in *Rowan* and *Playboy Entertainment Group*, the court determines that the do-not-call registry is a significant enough governmental intrusion and burden on commercial speech to amount to a government restriction implicating the First Amendment. The test enumerated in *Central Hudson* must, therefore, be applied in determining the constitutionality of the FTC's amended Rules.

### B. Are the Amended Rules Justified by a Substantial Government Interest?

Under the *Central Hudson* test, the party seeking to uphold a restriction on commercial speech carries the burden of justifying it with a substantial interest. *Edenfield*, 507 U.S. at 770, 113 S.Ct. at 1800. The government body seeking to sustain a restriction on speech cannot satisfy this burden with speculation or conjecture but must demonstrate that the harm is real. *Id.* at 770–771, 113 S.Ct. at 1800. Unlike other standards of constitutional review, intermediate scrutiny requires the court to examine only the government interest set forth by the government; the court cannot consider other possible interests in determining the regulation's constitutionality. *Id.* at 768, 113 S.Ct. at 1798. Here, the FTC asserts that it has an interest in protecting the privacy of those who indicate they do not wish to receive telephone calls from telemarketers in their homes. (Defs.' Br. at 23.) Additionally, the FTC claims that it has a substantial interest in curbing deceptive and abusive telemarketing practices. (Defs.' Br. at 29.)

The government's interest in protecting the well-being, tranquility, and privacy of the home is of the highest order in a free and civilized society. *Frisby v. Schultz*, 487 U.S. 474, 484, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) (citing *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2296 [(1980)].) Accordingly, the Supreme Court has recognized that "[p]reserving the sanctity of the home, the one retreat where men and women can repair to escape from the tribulations of their daily pursuits, is an important value." *Id.* Although in public locations it is the responsibility of the individual to avoid speech that he does not wish to hear, in the home a man is entitled to close off the rest of the world. *Id.* The ancient concept that "a man's home is his castle" into which "not even the king may enter" has lost none of its vitality; therefore, a citizen may erect a wall around his residence that no person may penetrate without his acquiescence. *Rowan*, 397 U.S. at 737–738, 90 S.Ct. at 1491. It is this "right to be let alone" that Justice Brandeis characterized as "the most comprehensive of rights and the right most valued by civilized men." *Hill v. Colo.*, 530 U.S. 703, 717, 120 S.Ct. 2480, 2489–2490, 147 L.Ed.2d 597 (2000) (citing *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564 [(1928)] [Brandeis, J., dissenting].)

One aspect of residential privacy is the right to avoid unwanted communications. *Id.; Hill*, 530 U.S. at 716, 120 S.Ct. at 2489. Thus, the Supreme Court has repeatedly held that individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom. *Frisby*, 487 U.S. at 485, 108 S.Ct. at 2502. The FTC's asserted interest in protecting privacy in the home is sufficiently substantial to justify a restriction in speech if the restriction fulfills the other requirements of *Central Hudson*. The Supreme Court has recognized the validity of this interest. *Rowan*, 397 U.S. at 728, 90 S.Ct. at 1484.

The FTC's asserted interest in protecting consumers from deceptive and abusive telemarketing practices is also a substantial government interest under *Central Hudson*. There is a substantial state interest in preventing deception and mistreatment of consumers. *Friedman v. Rogers*, 440 U.S. 1, 16, 99 S.Ct. 887, 897, 59 L.Ed.2d 100 (1979). Accordingly, the interest in preventing abusive telemarketing practices is sufficiently substantial to justify a restriction on commercial speech if the restriction fulfills the other requirements of *Central Hudson*.

## C. Do the Amended Rules Materially Advance the Substantial Interest Articulated by the FTC?

The FTC must demonstrate that the restriction on speech will advance, to a material degree, the government's interest in protecting privacy. *Edenfield,* 507 U.S. at 770–771, 113 S.Ct. at 1792. The regulation may not be sustained if it provides only remote support for the government's purpose. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2343. This requirement is critical; otherwise, a state could restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression. *Rubin,* 514 U.S. at 487, 115 S.Ct. at 1590 (citing *Edenfield,* 507 U.S. at 771, 113 S.Ct. at 1792).

At the outset, it is important to note the parties' agreement that all telemarketing calls are invasive of privacy, whether made for commercial or charitable solicitations. (Defs.' Br. at 25.) The FTC argues that the regulations creating the do-not-call registry materially advance the government's interest in protecting individuals from telemarketing calls they do not wish to receive, despite its limited application to only some types of commercial solicitations. (Defs.' Br. at 25–31.) According to the FTC, because there is an interest in reducing the number of unwanted telemarketing calls, every call prevented by the do-not-call registry furthers the government's interest in protecting privacy, regardless of the fact that other unwanted calls are not prevented. (*Id.* at 25.) If plaintiffs' estimates are credited, one may assume that the FTC's do-not-call registry might eliminate anywhere from forty to sixty percent of all telemarketing calls for those who subscribe, a substantial amount of unwanted calls. (Pls.' Br. at 10; Pls.' Reply at 27.) Plaintiffs counter that the registry is fatally under-inclusive because

it only affects unwanted commercial calls, even though telemarketing calls seeking charitable contributions are equally unwanted and invasive of privacy. (Pls.' Br. at 38–41.) The Supreme Court dealt with similar arguments in *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

In *Discovery Network,* Cincinnati prohibited news racks containing commercial handbills in order to further an asserted interest in city beautification. The city did not, however, prohibit news racks containing newspapers, which included both commercial speech and political speech. *Discovery Network,* 507 U.S. at 417, 113 S.Ct. at 1510. Noting that news racks containing commercial handbills only comprised 62 out of 2000 news racks in the city, approximately three percent (3%), the Court found that the regulation did not materially advance the city's interest in beautification. *Id.* Additionally, the court rejected the argument made by the FTC here: that *any* reduction in the number of news racks, no matter how small, furthered the city's purpose. *Id.*

The FTC has gone much farther in advancing its interest than the city did in *Discovery Network.* The assumed forty to sixty percent reduction in unwanted telemarketing calls significantly limits invasions of individual privacy, when that percentage is compared to the paltry three percent reduction in news racks achieved by the city in *Discovery Network.* Were the under-inclusive scope of the registry the only issue relevant to whether the registry "materially advances" the FTC's interest, this court would hold that the amended Rules pass this part of the *Central Hudson* test. Unfortunately for the FTC, however, *Discovery Network,* and other first amendment cases, indicate that numerical under-inclusiveness *per se* is not the fatal defect that renders a government

restriction on speech unconstitutional under the second prong of the *Central Hudson* analysis. Rather, the First Amendment imposes, not an "under-inclusiveness' limitation," but a "content discrimination" limitation. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 387, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992).[3]

The Supreme Court has held that, to materially advance the government's interest, the government is not required to make progress on every front before it can make progress on any front. *United States v. Edge Broad. Co.,* 509 U.S. 418, 434, 113 S.Ct. 2696, 2707, 125 L.Ed.2d 345 (1993). If the government avoids regulating certain fronts in attempting to materially advance its interest, however, it cannot justify its abstention on these fronts based on the content of the speech. *R.A.V.,* 505 U.S. at 387, 112 S.Ct. at 2545. "Regulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.,* 468 U.S. 641, 648–649, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984). In *Discovery Network,* the Supreme Court recognized content discrimination as the primary flaw in the city's regulation of news racks. *Discovery Network,* 507 U.S. at 417, 113 S.Ct. at 1510. The city's regulation failed under the First Amendment because the regulation distinguished between commercial and noncommercial speech, despite the fact that there was no evidence that the commercial use of news racks was more harmful to city beautification than other uses of news racks. *Discovery Network,* 507 U.S. at 418–419, 113 S.Ct. at 1511. When a regulatory regime is pierced by content-based exemptions and inconsistencies in the government's explanation as to

how the regime advances a substantial interest, it must fail under the First Amendment. *Greater New Orleans Broad. Ass'n, Inc. v. United States,* 527 U.S. 173, 190, 119 S.Ct. 1923, 1933, 144 L.Ed.2d 161 (1999). Simply stated, the government's practice cannot be at odds with the asserted government interest. *Id.* at 191, 119 S.Ct. at 1933. The regulation cannot distinguish among the indistinct, permitting a variety of speech that entails the same harm as the speech which the government has attempted to limit. *Id.* at 195, 119 S.Ct. at 1935.

Here, plaintiffs argue that the registry does not materially advance the FTC's interest because the FTC has made a content-based distinction between commercial and charitable solicitations for reasons unrelated to its interest in privacy. There is no doubt that unwanted calls seeking charitable contributions are as invasive to the privacy of someone sitting down to dinner at home as unwanted calls from commercial telemarketers. The FTC recognized this when promulgating the amended Rules. 68 Fed.Reg. at 4637. Realizing that its interest in privacy does not justify the distinction between commercial and noncommercial speech, the FTC attempts to justify the distinction by advancing several other arguments.

First, the FTC argues that nonprofit corporations and political fund-raisers are less likely than for-profit entities to engage in abusive practices because the consumer is both a potential donor *and* a potential voter or volunteer for the charity or political party. (Defs.' Br. at 29.) Distinguishing between commercial and noncommercial speech may be proper when it bears a relationship to preventing commercial

---

**3.** Although *R.A.V.* did not involve commercial speech or *Central Hudson* analysis, its explanation of the true goal of the "under-inclu-

siveness" limitation in first amendment jurisprudence is equally applicable to the *Central Hudson* test.

harms, such as fraud. *See Discovery Network,* 507 U.S. at 426, 113 S.Ct. at 1515.

This argument fails because there is no evidence in the administrative record or before this court that abusive and fraudulent telemarketing practices are more often instigated by commercial telemarketers than by charitable telemarketers. The importance of repeat business provides a commercial telemarketer with an incentive to act in a responsible and decorous manner which is as strong as the incentive possessed by a charitable telemarketer. *See Edenfield,* 507 U.S. at 776, 113 S.Ct. at 1803. Conversely, just because a corporation has made the necessary filings to achieve nonprofit or charitable status does not mean that its fund raising methods are beyond reproach. Many a mountebank has utilized the corporate form, including nonprofit incorporation, to perpetrate fraud on unsuspecting consumers. In any type of transaction where money changes hands, whether charitable or commercial, fraudulent deeds will find a foothold and pose a risk to the public. The FTC's attempt to justify its distinction between commercial and charitable solicitations on this basis, therefore, fails. Distinguishing between commercial and charitable solicitations in the telemarketing context does not materially advance the FTC's interest in curbing abusive or fraudulent telemarketing practices.

In the administrative record, the FTC indicates that it exempted charitable organizations from the do-not-call list because of the heightened First Amendment protection due charitable speech. 68 Fed. Reg. at 4586. This reasons fail under the First Amendment as a matter of law. Any attempt to distinguish between commercial and noncommercial speech solely because of commercial speech's lesser protected status under the Constitution "attach[es] more importance to the distinction between commercial and noncommercial speech than cases warrant and seriously underestimates the value of commercial speech." *Discovery Network,* 507 U.S. at 419, 113 S.Ct. at 1511 A content-based distinction cannot be made on constitutional grounds unrelated to the asserted government interest.

Finally, the FTC argues that the amended Rules do not create a distinction between commercial and charitable speech based on content, but based on secondary effects, which is permissible. (Defs.' Br. at 20–21.) According to the FTC, the secondary effects of the calls are the constant ringing of unwanted telemarketing calls. (*Id.*) A regulation is not considered content-based if the justification for distinguishing between content is not related to the content itself, but to the secondary effects of the content. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–49, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986). Even if invasion of privacy is regarded as a secondary effect, it does not justify treating commercial speech differently from noncommercial speech, since the secondary effect is the same for both types of speech.[4]

---

4. In the administrative record, the FTC states, "as a practical matter, the Commission believes that this approach will enable charities to continue soliciting support and pursuing their missions." 68 Fed.Reg. at 4586. This statement suggests that the FTC chose to exclude non-profit corporations from the registry based on favoritism of nonprofit corporations and their missions over the objectives of for-profit corporations. Such favoritism is not a valid reason for content-based regulation. The government may not regulate speech based on hostility or favoritism towards the underlying message expressed. *R.A.V.,* 505 U.S. at 386, 112 S.Ct. at 2545. Furthermore, because the FTC did not assert this as its government interest, such favoritism cannot justify the content-based distinction in this case.

Based on the forgoing, the court finds that the FTC's do-not-call registry does not materially advance its interest in protecting privacy or curbing abusive telemarketing practices. The registry creates a burden on one type of speech based solely on its content, without a logical, coherent privacy-based or prevention-of-abuse-based reason supporting the disparate treatment of different categories of speech. *See Pearson v. Edgar,* 153 F.3d 397, 404 (7th Cir.1998). Were the do-not-call registry to apply without regard to the content of the speech, or to leave autonomy in the hands of the individual, as in *Rowan,* it might be a different matter. As the amended Rules are currently formulated, however, the FTC has chosen to entangle itself too much in the consumer's decision by manipulating consumer choice and favoring speech by charitable over commercial speech. The First Amendment prohibits the government from enacting laws creating a preference for certain types of speech based on content, without asserting a valid interest, premised on content, to justify its discrimination. Because the do-not-call registry distinguishes between the indistinct, it is unconstitutional under the First Amendment. Having held that the amended Rules fail the second part of the *Central Hudson* test, the court chooses not to address the final part of the test or to determine the now-moot issue of whether the FTC may charge a fee for obtaining the do-not-call registry.

### 3. Statutory Authority Under the Telemarketing Act

Plaintiffs challenge the FTC's interpretation of the Telemarketing Act and argue that the FTC does not have statutory authority to promulgate rules concerning a do-not-call registry and abandoned calls. Because the court has already addressed the amended Rules concerning the do-not-call registry and held they cannot withstand constitutional scrutiny, it need only review the amended Rules concerning abandoned calls to determine whether the FTC had authority to promulgate them.

■■■ When a court reviews an agency's construction of a statute which it administers, the court must examine two questions. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). First, the court should examine whether Congress has, in the statute, addressed the precise question at issue in the agency's interpretation. *Id.* If the intent of Congress is clear, then the court and the agency must give effect to this intent. *Id.* at 842–843, 104 S.Ct. at 2781 If, however, Congress has not directly addressed the precise question at issue, the question for the court is whether the agency's interpretation of the statute is based on a permissible construction of the statute, *Id.* at 843, 104 S.Ct. at 2781–2782. If Congress, by failing to directly address an issue, has left a gap for the agency to fill, the agency's regulations filling this gap are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. *Id.* at 843–844, 104 S.Ct. at 2782. Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. *Id.* at 844, 104 S.Ct. at 2782.

■■■ First, plaintiffs argue that the FTC's regulations regarding abandoned calls regulate the use of predictive dialers, by prohibiting abandoned calls unless telemarketers utilize "technology that ensures abandonment of no more that three percent (3%) of all calls." (Pls.' Br. at 51 [citing 16 C.F.R. § 310.4(b)(4)(i) ].) Predictive dialers are machines employed in telemarketing, which use algorithms to determine the number of calls to prospective

customers which may be dialed simultaneously in order to ensure that when a sales agent is finished with one call he may transfer immediately to a new call dialed by the predictive dialer. (Pls.' Br. at 49.) Using a predictive dialer allows a telemarketer's sales agents to remain on the phone perpetually without any dialing or other down time, and provides an extremely cost-effective way of doing business. (*Id.*) The use of predictive dialers, however, often results in calls being "abandoned," when a sales agent is not available to transfer to the new call and the customer answering the telephone hears "dead air." (*Id.* at 49–50.)

Plaintiffs argue that regulation of predictive dialers, defined as "customer premises equipment" under the Communications Act, is within the sole jurisdiction of the FCC. (*Id.*) According to plaintiffs, therefore, the FTC does not have the jurisdictional authority to adopt regulations concerning abandoned calls, which affect predictive dialers. (*Id.*) The Communications Act defines "customer premises equipment" as equipment "employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications 47 U.S.C.A. § 153(14) (West 2001 & Supp.2003)." Predictive dialers qualify as "customer premises equipment" because they are employed on the premises of telemarketers to originate, route, and terminate telephone calls to potential customers. Regulation of predictive dialers, therefore, is within the jurisdiction of the FCC. The fact that the FCC has jurisdiction to regulate in an area, however, does not necessarily mean that the FTC lacks jurisdiction to regulate in the same area.

We live in an "era of overlapping agency jurisdiction under different statutory mandates." *FTC v. Texaco, Inc.,* 555 F.2d 862, 881 (D.C.Cir.1977). Here, Congress has given both the FTC and the FCC the authority to adopt regulations effecting the telemarketing industry. 15 U.S.C.A. §§ 6101–6108; 47 U.S.C.A. § 227. Specifically, Congress gave the FTC the authority under the Telemarketing Act to promulgate rules prohibiting "deceptive or abusive telemarketing practices." 15 U.S.C.A. § 6102. Congress required the FTC to define "deceptive or abusive telemarketing acts or practices." *Id.* In the amended Rules, the FTC defines abandoning calls as an abusive act or practice and requires telemarketers to either have a sales agent available to take the call or play a message with the seller's name and telephone number. 16 C.F.R. § 310.4(b)(1)(iv), (b)(4)(ii). The FTC was well within its authority to enact regulations defining "abusive and deceptive telemarketing practices," since Congress expressly granted the FTC this authority in the Telemarketing Act. *Chevron,* 467 U.S. at 842–843, 104 S.Ct. at 2781 As stated earlier, if the intent of Congress is clear in the statute, then the court and the agency must give effect to this intent. *Id.*

Plaintiffs argue that, although the FTC has express Congressional authority to define "abusive and deceptive telemarketing practices," the FTC does not have the authority to define the practice of abandoning calls as one of these practices because the FCC has exclusive jurisdiction over predictive dialers. (Pls.' Br. at 51–55.) Basically, according to plaintiffs, the FTC abused its discretion in concluding that the Telemarketing Act permits the FTC to define the practice of abandoning calls as an abusive and deceptive practice. Plaintiffs cite no cases showing that the FCC has exclusive jurisdiction over the regulation of abandoned calls or predictive dialers in light of the Telemarketing Act The cases cited by plaintiffs are inapposite because they address (1) the jurisdiction of

the FCC vis-a-vis the states, over interstate telecommunications and (2) the notion that the FCC regulatory scheme does not provide a basis for implied exemption from antitrust laws. *Essential Communications Sys., Inc. v. Am. Tel. & Tel. Co.,* 610 F.2d 1114, 1116 (3d Cir.1979); *Macom Prods. Corp. v. Am. Tel. & Tel. Co.,* 359 F.Supp. 973, 977 (C.D.Cal.1973). Plaintiffs' arguments do not address a situation where Congress has directly granted authority to one federal agency in an area where another federal agency already has jurisdiction, as is the case here. Based on independent research, the court finds no basis to conclude that the FCC has exclusive jurisdiction to regulate the practice of abandoning calls. Because Congress has not directly addressed whether the FTC can regulate abandoned calls, the question is whether the FTC's interpretation of the Telemarketing Act is a permissible construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–2782. The FTC's regulations are to be given controlling weight because they are not arbitrary, capricious, or manifestly contrary to the statute. *Id.* at 843–844, 104 S.Ct. at 2782. The court, therefore, holds that the amended Rules concerning abandoned calls rest on a valid interpretation of the Telemarketing Act.

Plaintiffs seem to claim that even if the FTC could define the practice of abandoning calls as abusive and proscribe such practice under its Rules, it still could not require predictive dialers to operate at ninety-seven percent efficiency, as such regulation of technology is the FCC's domain. This argument does not bear analysis. Because the FTC has the statutory to define abusive telemarketing practices and prohibit them, the FTC has the authority under the Telemarketing Act to prohibit all abandoned calls, and, therefore, all use of predictive dialers. Instead, in order to avoid forcing the elimination of predictive

dialers altogether, the FTC allowed that telemarketers could abandon up to three percent of all calls, enabling them to continue using predictive dialers. The FTC's statutory authority to do the greater certainly encompasses its authority to do the lesser. Plainly, the FTC has effectively defined abusive telemarketing as abandoning more than three percent of calls. Because the Telemarketing Act specifically grants the FTC the authority to define abusive telemarketing practices, the amended Rules pertaining to abandoned calls are within the statutory authority of the FTC under *Chevron.*

■ Plaintiffs argue that the FTC abused its discretion because the amended Rules concerning abandoned calls conflict with the TCPA and FCC rules. (Pls.' Br. at 55–59.) The FTC's amended Rules allow telemarketers to avoid liability for abandoning calls by playing a pre-recorded message with the seller's name and telephone number. 16 C.F.R. § 310.4(b)(4)(iii). The TCPA makes it "unlawful for any person. to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message" except for those calls "made for commercial purposes that the FCC determines.. will not adversely effect privacy rights ... and do not include the transmission of any unsolicited advertisement." 47 U.S.C.A. § 227(b)(1)(B), (b)(2)(B)(ii)(I)-(II). FCC rules except from application of the TCPA's prohibition those calls made for a commercial purpose that do not include unsolicited advertisements. 47 C.F.R. § 64.1200(c).

Based on a plain reading of these provisions, under the deferential review of *Chevron,* the FTC's amended Rules do not conflict with the TCPA or the FCC's rules. A pre-recorded statement of the seller's name and phone number is made under

the FTC's amended Rules as a means of identification, to prevent residents from fearing the call was made by a would-be burglar or assailant. In that sense, the pre-recorded identification message falls under the FCC's rule excepting commercial calls that do not contain any unsolicited advertisement. 47 C.F.R. § 64.1200(c). The court sees no conflict among the statute, the FCC's rules, and the FTC's rules. Accordingly, the FTC's amended Rules pertaining to abandoned calls are valid and enforceable under the Telemarketing Act.

### 4. Conclusion

Based on the foregoing findings and conclusions, it is

ORDERED as follows:

Plaintiffs' consent motion to amend the complaint (# 34) is GRANTED.

2. Plaintiffs' motion for summary judgment (# 24) is GRANTED in part and DENIED in part. It is GRANTED as to plaintiffs' claim that the FTC's amended Rules creating a do-not-call registry are unconstitutional under the First Amendment. It is DENIED in all other respects.

3. Defendants' motion for summary judgment (# 28) is GRANTED in part and DENIED in part. It is GRANTED as to plaintiffs' claim that the amended Rules concerning abandoned calls are invalid under *Chevron*. It is DENIED in all other respects.

4. The clerk shall enter judgment in favor of plaintiffs and against the FTC (1) enjoining the FTC from enforcing the amended Rules (issued in December 2002) creating and implementing a federal do-not-call registry and (2) dismissing with prejudice all of plaintiffs' remaining claims.