NATIONAL FEDERATION
OF THE BLIND

and

Special Olympics Maryland, Inc.,

v.

FEDERAL TRADE COMMISSION.

No. CIV. JFM–03–963.

United States District Court,
D. Maryland.

Feb. 24, 2004.

**710**

Glenn A. Mitchell, Stein, Mitchell and Mezines LLP, Washington, DC, Mark Errol Copilevitz, Copilevitz and Canter LLC, Kansas City, MO, for Plaintiffs.

Lawrence DeMille Wagman, Michael Daniel Bergman, Washington, DC, for Defendant.

## MEMORANDUM

MOTZ, District Judge.

Plaintiffs National Federation of the Blind and Special Olympics Maryland, Inc. ("Plaintiffs") have filed this action against Defendant Federal Trade Commission ("FTC") challenging the amendments to the Telemarketing Sales Rule promulgated by the FTC. These amendments impose modest restrictions upon the activities of professional telemarketers who solicit charitable contributions on behalf of non-profit organizations. Plaintiffs claim that the amended rule exceeds the FTC's statu-

tory authority and violates the First and Fifth Amendments to the United States Constitution. Pending before the court are the parties' cross-motions for summary judgment. For the reasons stated below, Plaintiffs' motion for summary judgment will be denied and Defendant's cross-motion for summary judgment will be granted.

## I.

### A.

In 1994, Congress passed the Telemarketing Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101 et seq. That legislation directed the FTC to prescribe rules prohibiting deceptive and abusive telemarketing acts or practices. 15 U.S.C. § 6102(a)(1). The definition of "telemarketing" in the statute was limited to plans, programs, or campaigns involving more than one interstate phone call, which sought to "induce purchases of goods or services." 15 U.S.C. § 6106(4) (1994). Congress also instructed the FTC to include several specific rules with respect to "abusive" practices, namely: (1) a requirement that telemarketers not undertake a pattern of unsolicited calls that the reasonable consumer would consider coercive or abusive of his right to privacy; (2) restrictions on the hours of the day and night during which unsolicited calls could be made; and (3) a requirement that the telemarketer promptly and clearly disclose to the consumer receiving the call that the purpose of the call is to sell goods or services. 15 U.S.C. § 6102(a)(3) (1994).

The Telemarketing Act expressly limited the activities that could be regulated by the FTC to those activities that were within the FTC's jurisdiction as defined by the FTC Act. 15 U.S.C. § 6105(a). Under the FTC Act, the FTC has jurisdiction over "persons, partnerships, or corporations," except for banks, savings and loan institu-

tions, federal credit unions, common carriers, and some other entities not relevant to this case. 15 U.S.C. § 45(a)(2). To qualify as a "corporation," an entity must be organized to carry on business for its own profit or that of its members. 15 U.S.C. § 44. Incorporating these jurisdictional limits into the Telemarketing Act meant that nonprofit organizations were exempt from the scope of the statute.

In 1995, the FTC promulgated the original Telemarketing Sales Rule to implement the Telemarketing Act, codified at 16 C.F.R. §§ 310 et seq. This rule prohibited various deceptive telemarketing practices, 16 C.F.R. § 310.3, and also regulated certain abusive practices. 16 C.F.R. § 310.4. The FTC's jurisdiction was not restated in the rule because the Telemarketing Act clearly defined the agency's jurisdiction by incorporating the FTC Act. 60 Fed.Reg. 43842, 43843 (Aug. 23, 1995). In addition, the FTC specifically stated in the Final Rule that it did not intend to expand or contract its jurisdiction or the scope of the rule's coverage. Id.

In October 2001, after the September 11 attacks, Congress passed the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act"), Pub.L. No. 107–56, 115 Stat. 272 (2001). Section 1011 of this statute amended the Telemarketing Act by expanding the definition of telemarketing to include calls intended to induce "a charitable contribution, donation, or gift of money or any other thing of value." 15 U.S.C. § 6106(4). The USA PATRIOT Act also added "fraudulent charitable solicitations" as a deceptive practice and directed the FTC to include rules in its regulations with respect to such solicitations. 15 U.S.C. § 6102(a)(2). Finally, the section of the Telemarketing Act describing the abusive practices that the FTC was to regulate was expanded to include a specific provision about the solicitation of charitable contributions. 15 U.S.C. § 6102(a)(3)(D). The USA PATRIOT Act did not, however, change the provision of the Telemarketing Act setting forth the FTC's jurisdiction. The FTC confirmed this point, stating, "Notwithstanding its amendment of these provisions of the Telemarketing Act, neither the text of section 1011 nor its legislative history suggest that it amends Section 6105(a) of the Telemarketing Act—the provision which incorporates the jurisdictional limitations of the FTC Act into the Telemarketing Act and, accordingly, the TSR." 67 Fed.Reg. 4492, 4496 (Jan. 30, 2002).

Soon after the enactment of the USA PATRIOT Act, in 2002, the FTC issued a Notice of Proposed Rulemaking that suggested a series of amendments to the original Telemarketing Sales Rule. The FTC received 64,000 comments about its proposed amendments and conducted a three-day public forum to discuss the amendments. 68 Fed.Reg. 4580, 4582 (Jan. 29, 2003). The Final Amended Rule ("TSR") was promulgated in January 2003. The TSR made clear that one consequence of the USA PATRIOT Act was the expansion of the coverage of the Telemarketing Act (and thus the Telemarketing Sales Rule) to those telemarketers often called "telefunders"—that is, for-profit entities that solicit charitable contributions on behalf of non-profit organizations. See 68 Fed.Reg. at 4584–85. The FTC stated, "Reading the amendments to the Telemarketing Act effectuated by § 1011 of the USA PATRIOT Act together with the unchanged sections of the Telemarketing Act compels the conclusion that for-profit entities that solicit charitable donations now must comply with the TSR, although the Rule's applicability to charitable organizations themselves is unaffected." Id. at 4585. The TSR also added more restrictions on tele-

marketing to the original rule, only some of which applied to telefunders.

The restrictions in the TSR being challenged in this case are the following: (1) a company-specific do-not-call provision, which prohibits a telemarketer from calling any consumer who has indicated that she wants no further calls from that particular seller or organization, 16 C.F.R. § 310.4(b)(1)(iii)(A)[1]; (2) a prohibition on "abandoned calls," which requires the telemarketer to connect the call to a representative within two seconds of the person's completed greeting, 16 C.F.R. § 310.4(b)(1)(iv); (3) a prohibition on placing calls before 8:00 a.m. or after 9:00 p.m., 16 C.F.R. § 310.4(c); and (4) a requirement that telemarketers transmit caller ID information, 16 C.F.R. § 310.4(a)(7). The TSR also includes a specific requirement that telefunders promptly identify themselves and tell consumers that they are soliciting donations. 16 C.F.R. § 310.4(e).[2]

### B.

Also relevant to the issues presented in this case are certain statutes and rules involving the Federal Communications Commission ("FCC"). In 1991, Congress passed the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, which directed the FCC to issue rules concerning "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). This statute expressly exempted calls or messages by tax-exempt nonprofit organizations from its definition of "telephone solicitation." 47 U.S.C. § 227(a)(3).

The FCC adopted rules implementing the TCPA in 1992, and in September 2002, it issued a Notice of Proposed Rulemaking seeking comments on whether to revise its TCPA rules. In early 2003, after the TSR was promulgated, Congress instructed the FCC to consult with the FTC to maximize consistency with the FTC's rules. In July 2003, the FCC released its final report amending the TCPA rules. The amended rules contain nearly identical provisions to those of the TSR that are challenged in this case, including the company-specific do-not-call provision, the time restrictions, the abandoned call provision, and the disclosure and caller ID provisions. *See* 16 C.F.R. §§ 64.1200, 64.1601. The FCC recognized that its amended rule would subject all commercial entities to its requirements, including those exempt from the FTC's jurisdiction. Report on Regulatory Coordination, 18 F.C.C.R. 18558, 18560, 2003 WL 22076540 (2003). However, the TCPA exempted nonprofit organizations from its provisions, and the amended TCPA rules maintained this exemption. 68 Fed.Reg. 44144, 44160 (Jul. 25, 2003). The FCC also concluded, "In light of the record before us, the Commission believes that there has been no change in circumstances that warrant distinguishing those calls made by a professional telemarketer on behalf of a tax-exempt nonprofit organization from those made by the tax-exempt nonprofit itself." *Id.*

### C.

Plaintiffs are both nonprofit organizations with tax-exempt status under § 501(c)(3) of the Internal Revenue Code. National Federation of the Blind is a

---

1. The TSR also created a national do-not-call registry and prevented telemarketers from calling any consumer whose name was included in this registry. 16 C.F.R. § 310.4(b)(1)(iii)(B). However, it specifically exempted all charitable solicitations from this provision. 16 C.F.R. § 310.6(a).

2. The same requirement is applied to commercial telemarketers in a parallel provision of the TSR. 16 C.F.R. § 310.4(d).

group that provides support for blind persons and their families, as well as education, information, and referral services about blindness. Special Olympics Maryland, Inc. provides sports training and athletic competition for citizens with mental retardation, as well as public education, community services, and outreach initiatives. Both plaintiffs require charitable contributions to fulfill their program services. However, they do not have the resources to use in-house volunteers or employees as telemarketers. Instead, they hire professional representatives to conduct telemarketing with the purpose of inducing charitable contributions. As a result, the provisions of the TSR directly impact Plaintiffs' telephone solicitation.

In their complaint, Plaintiffs seek declaratory and injunctive relief, challenging the TSR on several grounds. They claim first that the FTC did not have the statutory authority to issue the TSR. Second, Plaintiffs make a facial challenge to the TSR on various First Amendment grounds. Third, they allege that the TSR violates equal protection, as applied to the federal government in the Fifth Amendment. Plaintiffs also raise the same claims specifically with respect to the call abandonment provisions of the TSR.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The materiality requirement means that only those factual disputes that might affect the outcome of the suit preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order for there to be a "genuine" issue of material

fact, the evidence must be such that a reasonable jury could return a verdict for the non-moving party. *Id.* If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505.

Because this case involves review of the decisions of a federal administrative agency, the Administrative Procedure Act ("APA") is also applicable. According to the APA, the reviewing court may set aside agency action, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C). In making these determinations, the court must limit its review to the administrative record or those parts of it cited by the parties. 5 U.S.C. § 706; *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

In addition, in cases where an agency's construction of a statute that the agency administers is in issue, a court must apply the two-step analysis laid out in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It must first be determined whether Congress has directly spoken to the precise question at issue. *Id.* at 842, 104 S.Ct. 2778. If Congress' intent is clear, the court must give effect to that intent, and the analysis is complete. *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute is silent or ambiguous with respect to the specific issue, the court must decide whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. 2778. In this case, the *Chevron* analysis must be applied to the question of the FTC's interpretation of its authority under

the Telemarketing Act and the USA PA-TRIOT Act's amendments. However, the opinion of the FTC as to the constitutionality of its regulations is not entitled to any deference—if the court determines that these rules violate the Constitution, they must be invalidated. *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir.1979); *Mainstream Mktg. Serv., Inc. v. Federal Trade Commission*, 283 F.Supp.2d 1151, 1160 (D.Colo.2003).

The facts in this case are undisputed, and accordingly, the only question is which party is entitled to judgment as a matter of law.

### III.

### A.

Plaintiffs' first claim is that the FTC exceeded its jurisdiction by regulating in the TSR nonprofit organizations that employ telefunders. According to Plaintiffs, the USA PATRIOT Act does not evince an intention to regulate telefunders. Moreover, they contend that the USA PATRIOT Act amendments cannot be read to allow the FTC to regulate telefunders because such an interpretation would permit the FTC to indirectly exercise jurisdiction over exempt entities—namely, the nonprofit organizations themselves.

The plain language of the USA PATRIOT Act undermines Plaintiffs' contention. The Act expanded the definition of "telemarketing" to include solicitation of "charitable contributions," 15 U.S.C. § 6106(4). At the same time, the FTC's jurisdiction remained unchanged—that is, nonprofit organizations were still exempt from FTC regulation. 15 U.S.C. § 6105(a); 67 Fed. Reg. at 4496. The only logical conclusion that can be drawn from reading these two provisions together is that charitable solicitations by nonprofits themselves remain exempt, but charitable solicitations by professional representatives fall within the FTC's jurisdiction. If that were not the case, the addition of charitable contribution solicitations to the definition of telemarketing would have been meaningless.[3]

■ The FTC's interpretation of the statutes at issue is bolstered by case law regarding the jurisdiction of the FTC. Courts have held that an entity's exemption from FTC jurisdiction is based on that

---

**3.** In their briefs, Plaintiffs relied on statements made by Senator Mitch McConnell (R–KY) at the introduction of the USA PATRIOT Act to support the claim that this statute's amendments to the Telemarketing Act were intended only to target fraudulent charities and not to protect home privacy. Senator McConnell certainly emphasized the problem of false charities in his attempts to persuade Congress of the need for the legislation. *See* 147 Cong. Rec. S10059–01, S10065 (daily ed. Oct. 2, 2001). However, the statements of one Congressman cannot be treated as a definitive recitation of Congress' purposes with respect to the statute.

Additionally, during oral argument, Plaintiffs pointed out that, in section 1011(1) of the USA PATRIOT Act, Congress first amended the Telemarketing Act to include fraudulent charitable solicitations as a deceptive practice, and then, in section 1011(3), amended the Telemarketing Act to add charitable solici-

tations to the definition of "telemarketing." Plaintiffs argued that this sequencing demonstrates that Congress' intention was merely to regulate fraudulent charities, but when it recalled that the FTC did not have jurisdiction over charities, it needed to amend the definition of telemarketing to add charitable solicitations. This argument very well might accurately describe the sequence of events, but it does not prevail over the plain language of the statute. The original Telemarketing Act instructed the FTC to issue rules that would prevent fraud and protect consumers' right to privacy, *see* 15 U.S.C. § 6102(a)(3), and the TSR addresses both these concerns. Congress must have recognized that by amending the USA PATRIOT Act to include charitable solicitations in the definition of telemarketing, *all* the telemarketing rules would apply to charitable solicitations. Otherwise, it would have written the USA PATRIOT amendments differently.

entity's *status*, not its activity. *Official Airline Guides, Inc. v. Federal Trade Commission*, 630 F.2d 920, 923 (2d Cir. 1980); *Federal Trade Commission v. Miller* 549 F.2d 452, 455 (7th Cir.1977); *Federal Trade Commission v. American Standard Credit Sys., Inc.*, 874 F.Supp. 1080, 1086 (C.D.Cal.1994). Applied here, these cases indicate that because telefunders are not nonprofit entities, they can be regulated by the FTC, regardless of the fact that they engage in the same activities as the nonprofits. Indeed, two district courts have held specifically that professional fundraisers hired by nonprofit organizations are not exempt from FTC jurisdiction even though the nonprofits themselves are exempt. *Federal Trade Commission v. Gold*, No. 99–2895, slip. op. at 5 (C.D. Cal. Dec. 13, 2000); *Federal Trade Commission v. Saja*, 1997 WL 703399, at *1 (D.Ariz. Oct.7, 1997). I fully agree with this conclusion.[4]

### B.

Plaintiffs make a separate claim that the FTC exceeded its statutory authority by issuing the call abandonment provisions of the TSR. There are two kinds of "abandoned calls": those in which telemarketers hang up on consumers without speaking to them, and those in which there is a prolonged period of silence between the time the consumer answers the call and the time the representative is connected to the call. 68 Fed.Reg. at 4641. Abandoned calls result from the use of mechanisms called "predictive dialers," which call multiple consumers at a time to permit sales representatives to maximize the time they actually speak to consumers and minimize the time they spend waiting to reach consumers. *Id.* A side effect of the use of predictive dialers is that the dialer often reaches more consumers than can be connected to sales representatives, and as a result, the dialer either disconnects the call or keeps the consumer connected in case a representative becomes available. *Id.* at 4641–42. Abandoned calls are defined by the TSR as those in which a telemarketer does not connect the call to a sales representative within two seconds of the consumer's completed greeting. 16 C.F.R. § 310.4(b)(1)(iv). The TSR prohibits abandoned calls but constructs a safe harbor that allows telemarketers to use predictive dialers in a regulated manner.[5]

**4.** Plaintiffs' reliance on *Fruit Growers' Express Inc. v. Federal Trade Commission*, 274 F. 205 (7th Cir.1921) is misplaced. In that case, the FTC entered a cease and desist order against equipment suppliers, claiming that the suppliers had made an unlawful contract with certain common carriers which, under the FTC Act, are exempt from FTC jurisdiction. *Id.* at 205. The court held that the carriers were necessary parties to the action, and thus the FTC could not enter an order regarding the contract because the carriers were subject to the exclusive jurisdiction of the Interstate Commerce Commission. *Id.* at 206–07. In this case, however, the nonprofit organizations hiring the telefunders are in no way "necessary parties" to any violations of the TSR by those telefunders. As such, the rule in *Fruit Growers'* does not prohibit the FTC from exerting its jurisdiction over the telefunders. *See also Official Airline Guides*, 630 F.2d at 923–24 (distinguishing *Fruit Growers'* because the exempt air carriers were not necessary parties to the unlawful acts).

**5.** A telemarketer will not be held liable for abandoning calls if: (1) it employs technology that ensures that no more than 3% of calls are abandoned, measured per day per calling campaign; (2) for each call, the telemarketer allows the phone to ring for at least fifteen seconds or four rings before disconnecting an unanswered call; (3) whenever a representative is not available to speak to the consumer within two seconds of the consumer's completed greeting, the telemarketer plays a recorded message that states the name and phone number of the seller on whose behalf the call was made; and (4) the telemarketer retains records establishing compliance with the first three requirements. 16 C.F.R. § 310.4(b)(4).

■ Plaintiffs claim that the call abandonment provisions actually amount to a regulation of predictive dialers, and that the FTC has no authority to regulate these dialers because the authority to do so was given by Congress to the FCC. For support, they point to the TCPA, which restricts the use of telephone equipment and refers specifically to predictive dialers. 47 U.S.C. § 227(a)(1). However, Plaintiffs ignore the fact that while the FCC may have authority to regulate predictive dialers, the FTC was given authority in the Telemarketing Act to regulate abusive telemarketing practices. The FTC found in its notice and comment period that abandoned calls are "one of the most invasive practices of the telemarketing industry," because they frighten consumers, invade their privacy, and waste their time. 68 Fed.Reg. at 4642 n. 723. Although the FTC cannot regulate the dialers themselves, the Telemarketing Act does not restrict its authority to regulate abusive practices that may involve the use of dialers.

Plaintiffs cite no case law supporting their contention that the FTC and the FCC cannot both regulate the same area. On the contrary, the two district court opinions that have addressed this precise issue have held that the FTC has authority to regulate abandoned calls, despite the FCC's authority to regulate predictive dialers. *Mainstream Marketing Services,* 283 F.Supp.2d at 1170 ("[T]he court finds no basis to conclude that the FCC has exclusive jurisdiction to regulate the practice of abandoning calls"); *U.S. Security v. Federal Trade Commission,* 282 F.Supp.2d 1285, 1292 (D.Okla.2003) ("The [TSR's] restriction on abandoned calls is a permissible regulation of this most (and undisputedly) invasive and abusive practice, and its promulgation, which is in no way hindered or hobbled by the FCC's grant of authority, has carried into effect congressional intent as expressed by the [Telemarketing Act]"). Thus, while the

Telemarketing Act does not directly address this issue, the FTC's interpretation of its authority is an entirely reasonable construction of the statute.

## IV.

The bulk of Plaintiffs' argument focuses on the TSR's alleged infringement of First Amendment free speech protections. Plaintiffs claim that: (1) the TSR is a content-based regulation that requires strict scrutiny; (2) the government's interests in promulgating the TSR are not compelling, and even if they were, the TSR is not narrowly tailored to support those interests because the regulations are under-inclusive; (3) the TSR is overbroad; and (4) the TSR is an unlawful prior restraint.

## A.

■ Because charitable solicitation involves a variety of speech interests, it is entitled to the protections of the First Amendment. *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.,* 487 U.S. 781, 789, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Sec'y of State of Maryland v. Joseph H. Munson Company,* 467 U.S. 947, 959, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). If a regulation restricts protected speech, the court must determine which standard of review is applicable. The principal distinction in First Amendment cases is between those regulations that are content-based and those that are content-neutral. Content-based regulations are subject to strict scrutiny—i.e., the government must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Burson v. Freeman,* 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). By contrast, content-neutral regulations are subject to an intermediate level of scrutiny. *Turner*

*Broad. Sys., Inc. v. Federal Communications Commission,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Generally, laws that by their terms distinguish favored speech from disfavored speech on the basis of ideas or views expressed are content-based. *Id.* at 643, 114 S.Ct. 2445. Regulations that serve purposes unrelated to the content of expression are content-neutral, even if they have an incidental effect on some speakers or messages but not others. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In this regard, the government's purpose in passing the regulation is the controlling consideration. *Id.* Even if a law distinguishes among speakers, it is only subject to strict scrutiny when it reflects a government preference for the substance of what the favored speakers have to say or an aversion to what the disfavored speakers have to say. *Turner,* 512 U.S. at 658, 114 S.Ct. 2445.

■ The Supreme Court has articulated a specific standard of review that applies to charitable solicitations. When a government regulation is a direct and substantial limitation on charitable solicitation, it can only be sustained if it serves a sufficiently strong, subordinating interest that the government is entitled to protect. *Munson,* 467 U.S. at 960–61, 104 S.Ct. 2839; *Schaumburg,* 444 U.S. at 636, 100 S.Ct. 826; Moreover, the regulations must be narrowly drawn to serve the government's interests without unnecessarily interfering with First Amendment freedoms. *Schaumburg,* 444 U.S. at 637, 100 S.Ct. 826. While the Court never articulated that this standard was for content-neutral regulations, it closely resembles other content-neutral standards, such as the one applicable to time, place, and manner regulations. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746 ("government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference

to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information") (internal quotations omitted). Indeed, courts addressing this issue have held that the *Schaumburg/Munson* standard is an intermediate scrutiny standard applicable to content-neutral regulations. *See Nat'l Fed'n of the Blind of Arkansas v. Pryor,* 258 F.3d 851, 855 (8th Cir.2001); *American Target Adver., Inc. v. Giani,* 199 F.3d 1241, 1247 (10th Cir.2000).

■ Plaintiffs claim that the TSR is a content-based restriction that requires strict scrutiny. On its face, however, the TSR does not resemble those regulations that are traditionally found to be content-based—that is, it does not draw distinctions between different kinds of speech based on the content of the messages conveyed. The TSR applies evenhandedly to all "telemarketing," which the statute defines without reference to the subject matter or viewpoint of the solicitation. *See* 15 U.S.C. § 6106(4). Indeed, although suggestions were made to carve out exemptions to the scope of the TSR, the FTC decided that "no exemptions based upon the type of organization engaged in telemarketing are warranted, and that all telemarketing (as defined in the Telemarketing Act as amended by the USA PATRIOT Act) conducted by any entity within its jurisdiction should be covered by the TSR." 68 Fed.Reg. at 4589.

Nevertheless, Plaintiffs point to three different groups that are allegedly exempt from regulation by the TSR. The first group is composed of commercial banks, credit unions, savings and loan institutions, and common carriers. As noted in Part I *supra,* however, these entities are exempt from the TSR only because they are exempt from the jurisdiction of the FTC in general. 15 U.S.C. § 45(a)(2). Plaintiffs

do not cite, and I have not found, any case indicating that the exemption of a group from the scope of an agency's regulation due solely to its exemption from the agency's jurisdiction renders that regulation content-based.

Moreover, the gap created by the FTC's limited jurisdiction is filled by the FCC. The TCPA and the rules implementing it are applicable to all telemarketing, including those entities over which the FTC lacks jurisdiction. Report on Regulatory Coordination, 18 F.C.C.R. at 18560. Thus, the commercial entities outside of the FTC's jurisdiction are within the jurisdiction of the FCC. To ensure that these commercial entities are similarly regulated, the TCPA rules contain provisions restricting telemarketing that are almost identical to the ones set forth in the TSR. See 47 C.F.R. § 64.1200(a)(6) (call abandonment provision); § 64.1200(c)(1) (time restriction); § 64.1200(d) (company-specific do-not-call provision); § 64.1200(d)(4) (disclosure requirements); § 64.1601(e) (caller ID requirement). Because the FCC regulates these commercial entities to the same extent that the FTC regulates entities within its jurisdiction, this "exemption" from the TSR does not demonstrate any intent by the government to favor one group's speech over another because of the content of the message.[6] Cf. Lucas v. Curran, 856 F.Supp. 260, 273 (D.Md.1994) (in equal protection context, no discrimination between First Amendment rights when organizations exempt under one statute are regulated under other statutes).

Plaintiffs also claim that the TSR is content-based because of its exemption of charitable solicitations by nonprofit organizations that do not hire professional telemarketers. Again, nonprofit organizations are not expressly excluded in the language of the TSR, but they are exempt from its scope because the FTC lacks jurisdiction over them. 15 U.S.C. § 45(a)(2). Unlike the commercial entities exempt from FTC jurisdiction, nonprofit organizations are also exempt from the TCPA and the TCPA rules. 47 U.S.C. § 227(a)(3). However, the lack of regulation of nonprofit organizations would only necessitate strict scrutiny if it evinced an intent by the government to favor the content of their speech over any other group. See Turner, 512 U.S. at 658, 114 S.Ct. 2445. In this case, there is no differentiation based on the subject matter of the solicitations, but only on the status of the entities making the calls. The FTC could reasonably conclude, as it did, that professional telemarketers working on behalf of nonprofit organizations would be more likely to engage in fraud or overreaching than the nonprofits themselves because the professionals have a financial interest in obtaining the most contributions, whereas nonprofits are motivated by more altruistic concerns. See Special Programs, Inc. v. Courter, 923 F.Supp. 851, 860 (E.D.Va.1996); Lucas, 856 F.Supp. at 273.[7] Thus, the "exemp-

---

6. This reasoning applies equally to the claim Plaintiffs raise in their reply brief that insurance companies are exempt from the TSR. In fact, the McCarran–Ferguson Act states that only those activities that constitute the business of insurance and are regulated by state law are exempt from the FTC Act. 15 U.S.C. § 1012(b). Because the Telemarketing Act incorporates the jurisdictional limits of the FTC Act, such activities are also exempt from the TSR, but the TSR does not expressly exclude them on its face. Moreover, telemark-

eters selling insurance products are subject to the TCPA rules to the extent that such rules do not invalidate, impair, or supersede state insurance laws. See 68 Fed.Reg. at 44149–150.

7. Plaintiffs challenge the FTC's conclusion regarding the likelihood of overreaching by telefunders because of the lack of empirical evidence in the record. The Supreme Court has never laid down a categorical rule requiring that empirical evidence be shown to support every restriction on speech, and at least one

tion" for nonprofit organizations also does not make the TSR a content-based regulation. *See Famine Relief Fund v. State of West Virginia,* 905 F.2d 747 (4th Cir.1990) (applying content-neutral *Schaumburg/Munson* test to regulations restricting only nonprofits that use professional solicitors); *Telco Communications v. Carbaugh,* 885 F.2d 1225 (4th Cir.1989) (same).

Finally, Plaintiffs argue that the TSR is content-based because political speech is allegedly excluded from its scope. As with the first two alleged exclusions, the TSR by its terms does not expressly exempt any group or form of telemarketing, including solicitation by political organizations. Nevertheless, the FTC did indicate that it did not consider political *fundraising* to be within the scope of the TSR. *Id.* at 4589. However, this distinction was not an effort to carve out a particular subject matter from the TSR. Rather, it reflects the "basic common law distinction between charities and political organizations. 'Gifts or trusts for political purposes or the attainment of political objectives generally have been regarded as not charitable in nature. Also...a trust to promote the success of a political party is not charitable in nature.'" *Id.* at 4589 n. 106 (citing 15 Am.Jur.2d Charities § 60 (2002)); *see also* George Gleason Bogert et al., The Law of Trusts and Trustees §§ 328 and 378 (Rev.2d ed.1992); John D. Perovich, Annotation, *Validity and Construction of Testamentary Gift to Political Party,* 41

A.L.R.3d 833, 1972 WL 31883, §§ 3[c] and 4 (1972). Thus, political fundraising is exempt from regulation by the TSR not because it deals with politics as opposed to other subjects, but because gifts to political organizations are simply not considered "charitable," and accordingly, are not within the scope of the TSR.[8]

This basic distinction between charitable and political contributions is further evident from the fact that Congress has developed a completely separate scheme to regulate political fundraising. As noted by the FTC, Congress has established an administrative body—the Federal Election Commission ("FEC")—and a comprehensive and detailed statutory structure applicable to political fundraising, codified at 2 U.S.C. §§ 431–455. 68 Fed.Reg. at 4590. Federal election law includes provisions limiting sources from whom candidates may accept contributions, 2 U.S.C. §§ 441b, 441c, 441f; requiring candidates to disclose receipts and disbursements, 2 U.S.C. § 434; requiring them to make certain disclosures when soliciting funds, 2 U.S.C. § 441d; and prohibiting them from making fraudulent representations when soliciting funds. 2 U.S.C. § 441h. In addition to exemplifying the differences between charitable and political contributions, these regulations are significant to the *Ward* analysis of content-based regulations. According to *Ward,* the government's purpose is the primary focus of whether a regulation is content-based. As was the case with the commercial entities

---

court has specifically held that the absence of empirical evidence was not fatal to a speech restriction that distinguished between types of charitable solicitations. *Auburn Police Union v. Carpenter,* 8 F.3d 886, 899–900 (1st Cir. 1993).

**8.** Plaintiffs argue also that a political contribution falls under the definition of telemarketing because it is included in the catch-all phrase "any other thing of value." *See* 15

U.S.C. § 6106(4) ("The term 'telemarketing' means a plan, program, or campaign which is conducted to induce purchases of goods or services, or a charitable contribution, donation, or gift of money or any other thing of value"). As the FTC correctly points out, the phrase "any other thing of value" is modified by the adjective "charitable." Thus, even if a political contribution is a thing of value, because it is not charitable, it is not regulated by the TSR.

exempt from FTC jurisdiction, the extensive regulation by another agency of the activities of political candidates casts serious doubt on Plaintiffs' contention that the TSR was intended to favor certain groups or subject matter over others. *Cf. Lucas,* 856 F.Supp. at 273.

In sum, Plaintiffs have not demonstrated that the TSR is a content-based regulation requiring strict scrutiny. Accordingly, I will apply intermediate scrutiny to the TSR and use the *Schaumburg/Munson* test for content-neutral charitable solicitation.[9]

### B.

Under the *Schaumburg/Munson* test, a regulation that directly and substantially limits protected speech must be narrowly tailored to serve a substantial government interest. *Munson,* 467 U.S. at 960–61, 104 S.Ct. 2839. According to the FTC, the TSR had two basic purposes: to prevent fraud and to protect privacy in the home. 67 Fed.Reg. at 4497.[10] Courts have repeatedly held that the prevention of fraud in charitable solicitation is a substantial

interest that the government is entitled to protect, *Riley,* 487 U.S. at 792, 108 S.Ct. 2667; *Schaumburg,* 444 U.S. at 636, 100 S.Ct. 826; *Telco,* 885 F.2d at 1231; *Lucas,* 856 F.Supp. at 271, and that protection of privacy in the home from unwanted speech is also a strong, subordinating interest that justifies government regulation. *See Frisby v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); *Schaumburg,* 444 U.S. at 638, 100 S.Ct. 826; *Carey v. Brown,* 447 U.S. 455, 470–71, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).[11]

Still, Plaintiffs' contend that the TSR is not narrowly tailored to serve these interests because it is underinclusive. Underinclusiveness of a regulation has been found to be impermissible in three circumstances: (1) where underinclusiveness indicates that the regulation is intended to give one side of a debate an advantage over another, *City of Ladue v. Gilleo,* 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); (2) where the regulation excludes so much speech that it undermines the likelihood of a genuine gov-

---

**9.** Even if I were to apply strict scrutiny to the TSR, it would still be upheld based on the compelling nature of the government's interests and the narrow tailoring of the restrictions to serve those interests. *See* discussion *infra* Part IV.B.

**10.** Plaintiffs challenge whether the prevention of fraud was actually a government interest. To support this argument, they cite to one statement in the Final Amended Rule that only refers to the interest of protecting home privacy and not to the prevention of fraud. 68 Fed.Reg. at 4636. However, this statement was made with respect to the company specific do-not-call provision only. The Final Rule includes other statements relevant to the USA PATRIOT Act amendments and different provisions of the TSR that suggest the prevention of fraud as a government interest. *See, e.g.,* 68 Fed.Reg. at 4612–13 (USA PATRIOT Act amendments); 68 Fed.Reg. at 4627 (caller ID provision); 68 Fed.Reg. at 4635 n. 699 (do-not-call registry).

**11.** Plaintiffs claim that the government has no interest in protecting consumers' homes from charitable solicitations because, they assert, people do not feel their privacy is invaded by calls seeking charitable contributions. In support of this assertion, they cite to a portion of the administrative record indicating that only 100 consumer email comments received by the FTC responded to a direct question about whether charitable fundraisers should be treated differently from commercial fundraisers. 68 Fed.Reg. at 4637 n. 685. The FTC read this response to mean that consumers are disturbed by unwanted calls regardless of whether the caller wishes to make a sale or ask for a charitable contribution. 68 Fed. Reg. at 4637. This interpretation of the record is entirely reasonable. Indeed, if more people distinguished charitable and commercial calls with respect to the privacy intrusion involved, they presumably would have responded to the question.

ernmental interest, *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 396, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424–26, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); and (3) where the underinclusiveness is so severe as to cast doubts on whether the government is actually serving the interests that are supposed to justify the regulation. *Florida Star v. B.J.F.*, 491 U.S. 524, 540, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989); *see also City of Cincinnati*, 507 U.S. at 424–26, 113 S.Ct. 1505.

■ In this case, Plaintiffs claim that the TSR is underinclusive for the same reason that they argue it is content-based—namely, the exemption of certain commercial entities, nonprofit organizations that do not hire telefunders, and political fundraising. The rationale for my decision that the TSR is not content-based applies equally here. The TSR's even-handed application to all telemarketing demonstrates that by its terms, the TSR favors no speaker, subject matter, or viewpoint over any other. Furthermore, the extensive regulation by other agencies of all commercial entities and political fundraising indicates that the government's interests in preventing fraud and protecting home privacy are substantial and that the government is committed to furthering those goals as much as possible. The choice not to regulate nonprofit organizations simply reflects the government's reasonable conclusion that its interests would not be furthered by restricting these groups due to their differing incentives.

Furthermore, the regulations themselves are very narrowly drawn to prevent only particularly abusive practices and leave First Amendment rights largely unrestricted. Those provisions aimed to protect home privacy do so with limited interference on free speech. For example, the limits on calling time reflect concerns that calls at either end of the day are particularly invasive of home privacy, but they still provide a "reasonable window [from 8:00am to 9:00pm] for telemarketers to reach their existing and potential customers." 68 Fed.Reg. at 4647. In addition, company-specific do-not-call lists are much less invasive of speech than the national do-not-call registry, for telefunders working for nonprofits are permitted to call anyone once in an effort to convey their message and solicit donations. Yet these lists also uphold the consumer's right not to be forced to listen to speech that she has already identified as unwelcome. *See Rowan v. United States Post Office Dep't*, 397 U.S. 728, 737, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) ("Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit"). Finally, the call abandonment provisions target one of the most abusive telemarketing practices in terms of home privacy but still provide telemarketers with a safe harbor that is not unduly burdensome. Nonprofits concerned that this restriction will necessarily result in a decreased number of calls placed need only hire telemarketers that employ the practices delineated in the safe harbor provision. These practices are certainly feasible for professional telemarketers, and they are entirely reasonable given the important interest that is served.

In addition, the provisions intended to prevent fraud do not limit the number of calls made or interfere with the ability to convey a message. The Supreme Court has "repeatedly recognized the legitimacy of government efforts to enable donors to make informed choices about their charitable contributions." *Illinois ex rel. Madigan v. Telemarketing Assoc., Inc.*, 538 U.S. 600, 123 S.Ct. 1829, 1842, 155 L.Ed.2d 793 (2003). Specifically, the Court has upheld requirements that professional fundraisers disclose their professional status, *Riley*,

487 U.S. at 799 n. 11, 108 S.Ct. 2667, and that telefunders and charities disclose their finances. *Riley,* 487 U.S. at 800, 108 S.Ct. 2667; *Munson,* 467 U.S. at 961–62 n. 9, 104 S.Ct. 2839. Disclosure of the identity of the caller and the charity on whose behalf he is soliciting certainly furthers the government's interest in ensuring that consumers make informed decisions about their contributions. These disclosures also decrease the possibility that a caller soliciting on behalf of a fraudulent charity will succeed in his efforts. Moreover, a caller ID requirement allows anyone attempting to solicit for a fraudulent charity to be held accountable for his actions and permits consumers who have indicated an unwillingness to donate or be called again to avoid repeated calls by telemarketers ignoring their requests. *See* 68 Fed.Reg. at 4627.

In short, the TSR satisfies the standard set forth in *Schaumburg* and *Munson.* The FTC's interests in passing the regulation are substantial interests that the government is entitled to protect, and the restrictions are narrowly tailored to further those interests without unnecessarily interfering with freedom of speech.

### C.

Plaintiffs' next First Amendment argument is that the TSR is impermissibly overbroad. The term "overbreadth" can be used to describe two distinct sorts of First Amendment challenges. The primary meaning of "overbreadth" deals with prudential standing: a person whose own conduct is unprotected can bring an overbreadth challenge to assert the rights of third parties whose conduct is protected, even though the regulation as applied to the litigant would be constitutional. *Munson,* 467 U.S. at 967 n. 13, 104 S.Ct. 2839. In such an action, a regulation may be invalidated only if the overbreadth is substantial. *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.,* 482

U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). Specifically, the Court has required that there be "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). The second meaning of "overbreadth" is simply a challenge to a statute or regulation that in all its applications directly restricts protected First Amendment activity and is not narrowly tailored to serve the government's interests. *Munson,* 467 U.S. at 967 n. 13, 104 S.Ct. 2839.

In this case, Plaintiffs claim that the TSR is overbroad because it creates a chilling effect on all nonprofit organizations that use telefunders, preventing them from exercising their fully protected right to solicit charitable contributions. To support this argument, they cite to passages in *Munson* regarding prudential standing—that is, the *ability* of one whose speech is not protected to bring an action for the benefit of those whose speech is protected and whose rights are chilled by a particular regulation. *See Munson,* 467 U.S. at 956, 958, 104 S.Ct. 2839. Thus, Plaintiffs appear to be invoking the standing notion of overbreadth. However, merely citing to the statements from *Munson* does not prove that the TSR is actually overbroad. Plaintiffs have not demonstrated that there are third parties whose speech rights will be affected in a manner different from Plaintiffs' own rights, nor have they shown that these third parties' rights will be significantly compromised by the TSR. *See Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

It appears, therefore, that Plaintiffs are simply using the language regarding the

standing notion of overbreadth to support an argument for the second notion of overbreadth—namely, that the TSR is not narrowly tailored to restrict only as much speech as will serve the government's substantial interests. In that regard, I have already found that Plaintiffs' argument fails. The TSR is not impermissibly underinclusive, and the regulations themselves are drawn extremely narrowly.

### D.

 Plaintiffs' final First Amendment argument is that the TSR, including its call abandonment provisions, is an unlawful prior restraint. Prior restraints have been defined as "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). Such orders may take the form of temporary restraining orders or permanent injunctions issued by courts, *id.,* or licensing schemes in which administrators are given unbridled discretion to determine a speaker's right to be heard. *FW/ PBS, Inc. v. City of Dallas,* 493 U.S. 215, 225–26, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Saia v. People of State of New York,* 334 U.S. 558, 560–61, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). Prior restraints are presumptively unconstitutional; the government must meet a heavy burden to justify any such restraint. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 558, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

In this case, Plaintiffs claim that the TSR is an unconstitutional prior restraint because it "silences" the speech of nonprofit organizations that use professional telemarketers. It appears Plaintiffs are proposing that any regulation that inhibits or chills protected speech in some way is a prior restraint because the chilling effect of potential future punishment would prevent some speech before it would normally be made, absent the regulation. *Lucas,* 856 F.Supp. at 269. Under this theory, all time, place, and manner restrictions would be prior restraints because they place some limits on speech before the speech is actually uttered. *Id.*

 Such a view misunderstands the meaning of "prior restraint" and ignores the long-held distinction between prior restraints and subsequent punishments. While it is presumptively unlawful to bar speech before it occurs, First Amendment law fully accepts the ability to penalize speech that occurred in the *past,* after it has been challenged and the speaker has had the opportunity for appellate review. *Alexander,* 509 U.S. at 553–54, 113 S.Ct. 2766; *Nebraska Press,* 427 U.S. at 559, 96 S.Ct. 2791. In this case, the TSR does not require any speaker to obtain a permit or license before he speaks, nor does it forbid any speech outright. Telemarketers are free to call anyone that they wish and say anything that they want. The time and manner of speech are somewhat limited, and certain disclosures must be made, but the ability to speak and the core message that is conveyed are untouched by the TSR. Furthermore, it is only after the speech is uttered that, if the telemarketer has violated the TSR, he may be brought into court by the state or a private individual. *See* 15 U.S.C. §§ 6103 and 6104. This is a typical subsequent punishment, and holding otherwise would practically erase the line between prior restraints and subsequent punishments. *See Alexander,* 509 U.S. at 554, 113 S.Ct. 2766.

### V.

 Plaintiffs' third challenge to the TSR is that it violates the equal protection clause, as applied to the federal government in the Fifth Amendment. Equal protection analysis requires strict scrutiny of a government regulation when the regulation interferes with the exercise of a

fundamental right or operates to the particular disadvantage of a suspect class. *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Rights protected by the First Amendment are fundamental rights. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 54, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Murgia,* 427 U.S. at 312 n. 3, 96 S.Ct. 2562. Because charitable solicitation is fully protected under the First Amendment, and the TSR interferes with the ability of nonprofit organizations using telefunders to engage in charitable solicitation, strict scrutiny must be applied. *See also Carey v. Brown,* 447 U.S. at 461–62, 100 S.Ct. 2286 ("When government regulation discriminates among speech-related activities...the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized"); *Special Programs,* 923 F.Supp. at 856–57 (citing *Carey* and applying a strict scrutiny standard); *Lucas,* 856 F.Supp. at 272 (same).

■ For the same reasons that the TSR withstands First Amendment analysis, it withstands equal protection analysis, even under a strict scrutiny standard. On its face, the TSR does not discriminate between any groups; it applies evenhandedly to telemarketing conducted by all entities. Of the groups cited by Plaintiffs as being treated more favorably by the TSR, two of them—commercial entities and nonprofit organizations that do their own soliciting—are exempt from FTC jurisdiction and cannot be regulated by the TSR even if the FTC wished to do so. Furthermore, the commercial entities are regulated almost identically by the FCC in the TCPA rules. Under these circumstances, it is evident that the government is not dis-

criminating between the First Amendment rights of nonprofit organizations and commercial entities. *See Lucas,* 856 F.Supp. at 273.

The same holds true for political fundraising, the third so-called "exemption" from the TSR, which is fully regulated by the FEC and federal election laws.[12] The only entities identified by Plaintiffs that are not regulated at all are nonprofits that do not hire telefunders. However, the exemption of this group satisfies the strict scrutiny standard. The interests of the government in protecting privacy and preventing fraud are certainly substantial, *see* discussion *supra* Part IV.B., and the exclusion of these nonprofits from regulation reflects a legitimate belief that they will be less likely to engage in the sort of behavior the TSR is intended to prevent. *See Special Programs,* 923 F.Supp. at 860; *Lucas,* 856 F.Supp. at 273.

A separate order is being entered therewith.

---

**12.** Even though political fundraising is not exempt from FTC jurisdiction, it is not cov-

ered by the TSR because it is not "charitable." *See* discussion *supra* Part IV.A.